And our last case of the afternoon is Armament Services v. Attorney General No. 18-1125. Good afternoon, Your Honors. My name is Adam Kraut. I represent ASI and Mara Kalerchian. I've asked if I may reserve five minutes for rebuttal. That will be granted. Okay. It seems to me that this case is also going to dance around the willful violation issue. The place let's start, just so we can all be on the same page. Yes, Your Honor. Do you agree with the standard that was in our NPO and that all the circuits have adopted? Yes, Your Honor. Okay. I think that's a fair standard to adopt. And I think really what we need to parse out then is when we're talking about deliberate indifference or plain indifference and then a deliberate violation of it. And I have some examples that I think may help with that a little bit, as well as an example to kind of put things into a field you may be familiar with just to kind of keep in the back of your mind here as we're going through some of the stuff. So the two examples I want to start off with, one Mr. Prince kind of already covered, but it comes from Fairmount Cash Management, where ATF put an undercover agent into the store. Undercover agent says, I'm a felon. Shop sells him a gun. They put the information into NICS incorrectly so that it goes through first time. Second transaction, same guy comes in. They sell a gun, puts it in correctly, gets the denial notice, transfers the gun. Third time, comes in with a woman, straw purchase, transfers the gun. I think for that example we can all agree that's very deliberate, not plain indifference. That's just a deliberate action taken. As far as the plain indifference example, that's really where we need to parse things out here. And I think the example that may help you in the back of your minds as we're going through this is, you all have law clerks, right? Let's say that there's a statute that criminalizes the distribution of certain information absent the government providing approval with a form. Your law clerk, you direct them to send documents back and forth to individuals. Your law clerk's clearly aware of the law and the regulations because they do this for a living. Ultimately, the government contends that the information went to an individual who shouldn't have had it. They criminally prosecute you. And they say that your law clerk can no longer continue to do what they do because they were acting at your direction and they had familiarity with the regulations. Even though the law clerk had no idea that that person shouldn't have had that information. That's where the rabbit goes in the hat, right? When you say even though the law clerk had no idea that that person shouldn't have information. The argument here is that your client, the individual, how do you say her? Kalerchian. How do you say it? Kalerchian. Kalerchian? Yes. That she did know that there were correspondence with the sheriff's office. The sheriff had personal accounts. There were things communicated that made it clear she knew exactly what was going on. So let's stick with that fact pattern. Why is it wrong for the court, excuse me, the district court, to have looked at that set of facts and said, yeah, at a minimum there was claim indifference here. Sure. So let's take those in turn as best as I can remember them. As far as the personal emails being involved, there was testimony from IOI Perkins at the administrative hearing that most people just hit reply. They don't look to see the email address that it's coming from. If we can accept that as a valid argument there, we can move on to the next part of this as far as the emails themselves. Those emails that were sent back and forth, they were done at the direction of Vaughn Kalerchian. And in those emails, if you look to see what was actually sent, a lot of it was requests for paperwork that was required by ATF. There were some sample demonstration letters sent out. Those sample demonstration letters were also found in ATF's NFA handbook. H&K, the company that manufactured some of the machine guns at issue in here, provided a sample demonstration to the ASI and Mrs. Kalerchian to pass along to the department. As far as the destruction of machine guns or the pictures of the firearms, how to lawfully destroy them, again, that's something that ATF publishes freely on the Internet. I could have been misunderstanding this, but I thought there were letters that were sent that were saying, on the one hand, these are for exclusive use to the sheriff's office, and on the other hand, communications that were going to the sheriff explaining how to break these things down. You could sell it for parts. I got a mistake about the record there. To the best of my recollection, Your Honor, I'm not going to try to mislead you. To the best of my recollection, I don't believe so. The government had a number of exhibits in the administrative record, and I can try and dig for them off the top of my head. I can also try and look for a rebuttal for you, but they had a whole section of emails that Maura Kalerchian specifically had been involved in, and I went through and looked at the emails that they had in the administrative record from the first, second, and third machine gun transactions. Anything that had to do with the procurement of the guns as far as how it would be divvied up amongst the parties who were allegedly profiting from this, things of that nature. None of them involved Maura with the exception of one, I believe, where she was carbon copied on it. I believe that email went to H&K, and that was an email from Mr. Kalerchian saying that, please copy my assistant as I'll be traveling. She'll forward all the paperwork. But as far as the actual distribution of parts, how things would be broken up amongst Chief Deputy Coombstar, presumably Mr. Kalerchian, and I believe Ronald Slusser, that Maura, to the best of my recollection, wasn't involved in any of those. Can I ask you a question? Yes, Your Honor. It was a head-scratcher. Everybody seemed to assume it, but you said repeatedly in your brief that the court held that Maura is not a co-conspirator. I read the transcript. Maybe you can point out where they say that. I read it as, I mean, somebody pushed for that, and what the court found was, well, at least there's an agency status going on. That's as far as I think it went. Is there a place where the court holds she is not a co-conspirator? The court in that, and you're referring to the criminal trial of Mr. Kalerchian? Yes, I am. Yes, so my understanding of the way I read it anyway was that under the Santiago standard, in order to have somebody brought in as a co-conspirator for the purposes of an agency status, right? Well, and they found that she, by the preponderance of the evidence, that didn't rise to that level. They found that for Santiago she wasn't a co-conspirator. Well, but where is that? I don't see that. I don't see where a court makes that finding. I do see at the very least there's an agency status going on on page, let's see, 232 of 257 in the transcript, but lines 11 and 12. Your Honor, I'll have to look and see if I can grab that for you on rebuttal because off the top of my head, I don't have an answer for you. Let's just take it as a given that for a discussion that there was a ruling that statements would not come in under the co-conspirator exception to the hearsay rule, how does an evidentiary ruling like that resolve as a matter of collateral estoppel the question of whether or not she is an aider and a better? Well, Your Honor, I don't know if in a civil context. I don't know if it directly answers it, but I think in the context of if you look at it as if they can't show by preponderance of the evidence, which is a fairly low evidentiary burden that she was a co-conspirator, how can they show that her actions were willful? And this goes back to now we're going back to, okay, well, willful is inserted into the gun contract. It should have some meaning. Now we're going back to deliberate or plain indifference. Well, if she didn't know her actions were unlawful, she believed that everything was above board. She didn't have any information, and I don't see anywhere in the record where it shows that she had information. This was not a lawful transaction. How can they argue that she's now aiding and abetting a conspiracy with no knowledge of a conspiracy actually happening? There you go. That's the problem, right? When you say how can it be when she had no knowledge, the assertion from the government is there is circumstantial evidence that she did know. And the fact that a trial judge in the middle, in the midst of a criminal trial with respect to her husband, makes an evidentiary ruling that co-conspirator statements are not going to come in, or that statements are not going to qualify as co-conspirator statements, that doesn't seem to resolve the issue in a way that prevents another tribunal from looking at this and saying, no, there's enough circumstantial evidence here for us to reach a conclusion of aiding and abetting. I understood your argument to be that the district court just couldn't even look at that, that was blocked off by collateral estoppel, and I'm not following you to the end of that logical trail. Okay, Your Honor. I think in that vein, if we're looking at it, the best way to kind of go about it is just simply going to be that, as far as aiding and abetting, let's just remove the estoppel even. Let's just go to the aiding and abetting, because I think that's really where we ultimately have to end up if we're going to reject the estoppel argument, is that if she didn't have knowledge of it, and again we're now kind of bringing in some criminal law aspects into it, if she didn't have any knowledge of it, how could she be aiding and abetting? I understand the government's response to that to be things like, she sends to Chief Kumstar transaction information, she includes him on e-mails to picture how to cut up machine guns, so that they'll no longer be a machine gun, she is involved with them in a way that sheriff says, it was just like dealing with Mr. was just like dealing with Mrs. and vice versa. From their perspective, they were the same and knew what was going on. If there's that evidence in the record, why can't the government rely on that record as the basis for saying, no, there's evidence that she did know, that she understood what was going on. I mean, you're saying, take it as a given she didn't, I need you to address, we need you to address, what they say is evidence that she did know. I see my time's up, would you like me to follow up? So I think when we're looking at it, there's a couple of things. One, if we're talking about the financial aspects of it, there was testimony from Ernest Littner, the government's expert witness, that it's not uncommon for others to pay for department guns. If we're talking about the e-mails that were exchanged, particularly things as far as demonstration letters, invoices, that's all in the regular course of business for a licensee to do. So I don't know if there's anything abnormal about that conduct, even the destruction of a machine gun or a receiver, for that matter. I mean, you can even remove the machine gun aspect out of it. There's certain ways that you can cut up receivers in order to make them no longer firearms for the purposes of the Gun Control Act. So I'm not sure that any of that, especially if at the point in time she didn't know ASI was getting any of these parts back to sell, things like that. I don't know if there's a way that you can push that ball so far to say that she knew enough that she was aiding and abetting. Okay, thank you. Ms. DeBroeker, did I get your name right? Correct, Your Honor. Lauren DeBroeker for the United States. Thank you. I appreciate the court's – can the court hear me okay? We'll do a quick microphone check. It's fine, thank you. Thank you very much. I think it's important to keep in mind here, Your Honor, the limited issue that's on appeal and the limited scope of review that the court is to apply to that issue. What's on appeal today, Your Honor, is whether the ATF is authorized under the Gun Control Act to deny ASI's applications to renew its three federal firearms licenses and authorized to deny for a license in her opinion. Is there a different standard for denial than for revocation? No, Your Honor, it's all the same. The basis for the ATF, the ATF must deny an application for a firearms license or to renew a firearms license when the ATF has reason to believe that the applicant or the renewal applicant willfully committed a violation of even one provision of the Gun Control Act. On judicial review of that decision, the ATF's decision must be upheld if there is substantial evidence in the record supporting that determination. As this court held in Taylor, a violation of the Gun Control Act is willful when the applicant knew of their legal requirements under the Gun Control Act and related regulations and rules, and either purposely disregarded those obligations or acted with plain indifference to those obligations. I guess just to round up the circle, you agree as well that is the appropriate standard, the one we enunciated in our NPL? I do, Your Honor. Okay, thank you. It has been universally adopted by every circuit court to consider the issue. I think that's evidence that is the right way to go. In the case of ASI, how do you show that it had the requisite plain indifference to its obligations? In the case of a corporate licensee, which ASI is, the law is clear that the corporate licensee is attributed with both the knowledge and the conduct of any of its employees. In the Northern District of Indiana, Mr. Colergean, who was at the time ASI's president, 50% shareholder, and responsible person under the Gun Control Act, a jury in the Northern District of Indiana convicted Mr. Colergean of willfully violating two separate provisions of the Gun Control Act. What's the status of that right now? Is it still on appeal or has that been resolved? It was on appeal before the Seventh Circuit, Your Honor. We do not yet know the basis of Mr. Colergean's appeal as he has not yet filed his brief on appeal. What's the significance of that appeal pending? Does it matter in terms of what happens in this case? It does not, Your Honor. To credit, if the court were to credit Appellant's argument, they would argue that the ATF based its decision on these licenses based on nothing more than the fact that Mr. Colergean was convicted. If that were the case, the administrative record in this case would have consisted of nothing more than a docket entry from the Northern District of Indiana. Here, Your Honor, the record consists of thousands of pages that consist of evidence that was put on in the criminal trial, the guilty pleas of the co-conspirators in the criminal trial, documentary evidence from the criminal trial as to Mrs. Colergean's own actions and interactions with the conspirators, testimonial evidence from Chief Kumstar, who was one of the chief orchestrators of this conspiracy, that he dealt with Mrs. Colergean on a regular basis. Based on his interactions with her, she knew what was going on in this conspiracy and acted to break it down. So if his conviction is vacated, it won't matter here? No, Your Honor. What's important to consider is that of all the factual evidence that is in the record and that ATF relied on in making this decision, appellants have disputed none of it. There is not one issue of material fact in this case in dispute. At the administrative hearing on these licenses, appellants put on no testimonial evidence. Mrs. Colergean didn't take the stand. They called no witnesses. They disputed none of the factual record that ATF based its opinion on. Based on that, Your Honor, we submit that there is not only substantial evidence but substantial undisputed evidence supporting the ATF's decision in this matter. Does it matter whether evidence is disputed or not in this context? It's a question that the district court addressed in some detail, Your Honor. On review, again, the ATF's decisions are to be upheld if they are supported by substantial evidence. The evidence need only support a single violation of the Gun Control Act. So if there are disputed issues of material fact with relation to some alleged violations of the Gun Control Act, as long as there is substantial evidence and undisputed evidence showing a single violation of the Gun Control Act, it doesn't matter that there's disputes as to the other violations. Okay, but my question to you is, as a matter of law, does it matter whether evidence is disputed or not? Assume there's only one. If it's disputed, does the court say, well, that's it, it's disputed, we can't deal with this? Or can the court say substantial evidence supports this decision even if it is disputed? I think the jurisprudence on the Gun Control Act and licensing decisions is very clear that the substantial evidence standard controls. And so even if there are disputes as to the evidence and even if the court may have decided in its own review that it would have decided the other way, is not what's at issue here. The issue is whether it's supported by substantial evidence. How does this language about undisputed work its way into the discussion? Well, we submit, Your Honor, that the fact that the appellants have not disputed any material fact that the ATF relied on is dispositive. I'm trying to figure out the legal piece here, not this specific case. We see language sometimes that talks about substantial undisputed evidence. Why does that undisputed word show up? If we start using that kind of language, are we singing the wrong song? I think, again, to Your Honor's point, it is not required that the evidence be undisputed. We simply think that that's a compelling reason to find a big BATF on this matter. But it is not part of the legal standard, Your Honor. Okay. What is your best example of a willful violation committed by Mara? I can think of two, Your Honor. And again, a willful violation requires that, number one, Mrs. Kalerzian knew of her obligations under the Gun Control Act, and, number two, acted with plain indifference to those obligations. Importantly here, and unlike in the Simmons case that the Court just heard, there is no dispute here that Mrs. Kalerzian knew what her obligations were under the Gun Control Act. That is a fact that is not in dispute. The only question is whether she acted with plain indifference to those obligations. When IOI Perkins interviewed Mrs. Kalerzian in connection with her application for her license, she told him that at the time of the conspiracy, she believed that the Lake County Sheriff's Department was in fact going to get close to 20 of the firearms that ASI had represented would be going to the Sheriff's Department. To be clear, the ASI and Mrs. Kalerzian submitted paperwork indicating that the Sheriff's Department was purchasing 71 firearms,  we believe that her undisputed testimony, the undisputed testimony that Mrs. Kalerzian said, yeah, I believe that 20 of them were going to go to the Sheriff's Department, is an admission that she knew that more than 50 of those firearms were not going to go to the Sheriff's Department, contrary to her express representation to the manufacturer of those guns when she submitted the paperwork required to be truthful and honest as to who the true purchaser of those firearms were. Secondly, Your Honor, the ATF investigated and did an inventory search of the Sheriff's Department in February of 2011 and found that none of the 71 machine guns that ASI and Mrs. Kalerzian had said were going to the Sheriff's Department were actually there. Two weeks later, Mrs. Kalerzian sends an email to Chief Pinstar with instructions as to how to destroy a machine gun. Chief Pinstar testified in a criminal trial that Mrs. Kalerzian sent him that email while he was on the phone with Vaughn Kalerzian talking about how to destroy these guns. Two months later, ATF found these machine guns in parts on the property owned by Chief Pinstar's father. Is there any sort of legitimate use for instructions on how to break up a machine gun? They're public information, Your Honor, and I think appellants are arguing that this Court should look at the evidence that ATF relied on in individual pieces. No, it's not illegal to send an email with instructions as to how to take apart a machine gun. But viewed as a whole, we believe that particular email shows that Mrs. Kalerzian knew what was going on, was not simply following instructions, and absolutely was facilitating these transactions, and not only that, facilitating the cover-up of these transactions by providing information as to how to destroy the machine guns so they wouldn't be found. If there's nothing more, then... Actually, one further point, just because I do have some time. You do have some time. I would encourage the Court to look at the notion of a responsible person. Mrs. Kalerzian was listed by ASI since 2002 as a responsible person on her license. That is not an empty provision. Contrary to appellants' arguments, it is defined in the Gun Control Act what a responsible person is. That listing and that identification of a responsible person is critical to the enforcement of the Gun Control Act, particularly with respect to appropriate licensing. Mrs. Kalerzian was a responsible person on the license, and with that... Do you have a responsibility, does the government have an obligation to prove that she had the power to direct and control the corporation? No, Your Honor. And in fact, the language of the responsible person language requires that she be identified if she possesses, directly or indirectly, the power to influence the firearms business. It doesn't matter that she exercised that power. It doesn't matter that she ever does exercise that power, or ever intends to. It is the mechanism by which ATF holds firearms dealers responsible for each of its employees, and it's how it makes sure that these meticulous and strict requirements of the Gun Control Act are followed. Based on that, Mrs. Kalerzian, as a responsible person for ASI, is in fact responsible for the crimes of her husband in addition to the actions of ASI as a corporation. The Court has no further questions. We do not. Thank you so much for your argument. Counsel will hear your rebuttal. Incidentally, nice tie. It's holiday-ish, you know? You shamed us all. We should have all been wearing it. You know, I've been waiting two years to wear this tie because I've never had to get dressed up around Halloween. So just a few points to address here. With regard to the ATF's denial in the government's position that it wasn't at all based on Mr. Kalerzian's actions, the question that this Court needs to wrestle with is if there was such substantial evidence that the government's saying exists, why did they wait until the criminal matter ended prior to denying the applications? Up until then, they continued to issue letters of authorization for ASI to continue doing business. Mrs. Kalerzian's application wasn't until after that guilty verdict came in, so she can be removed from that. But they did continue to issue letters of authorization for ASI. How does that redound to your client's benefit? The fact that they may have wanted to give her additional time, or they might view it as giving her a break until seeing how the trial played out, how does that undermine their position that she's a responsible party and we're getting a whole bunch of evidence that's going to bear on what we're doing, let it play out? How does that undermine their position? We'll get to the responsible person in just a moment, Judge, but I think as far as the rest of that all taken into context here, it would seem anyway that you could infer that the government believed if it didn't get a guilty conviction, action on that license may not have ended up the way it did. Maybe it would have. I think it's fair to say it could have gone either way. Well, you've got to prove criminal fault beyond a reasonable doubt. A license renewal or rejection or revocation are not the same standards. So it's conceivable that Mr. Clerchian is acquitted, and they still will decline to give the license, right? Well, and therein lies an interesting question and a little bit of a problem, at least from my perspective, if you will. If they're saying that the actions that Mr. Clerchian took were unlawful, attributing it to ASI, the corporation, and I suppose Mrs. Clerchian's actions as well because she was listed as a responsible person, if he's acquitted of any wrongdoing, then how can you continue to push other than the burden being lesser, saying that the corporation did something wrong? Well, indeed, there is a statute that says if you're acquitted of certain acts, 923, the government can't go after you to do something negative to your license, right? Correct, and the part here that becomes problematic, if you will, Mr. Clerchian has his own license and his own name, and then he's also a responsible party on ASI. So in that sense, let's go down the hypothetical road. Let's say Seventh Circuit overturns his conviction and he's acquitted of wrongdoing. He gets to keep his license in his name. However, this court finds that there was a willful violation. So ASI loses its license, Laura Clerchian, its application is denied, and the problem here now goes to the responsible person. The responsible person, the only place it's defined in the Gun Control Act, in the regulations, is in light of ATF's recent 41F regulation in regards to trust and stuff. As far as FFLs, it's not, and we cited in our principal brief at the bottom of page 22, if you look at footnotes 19, that the term's not defined or mentioned anywhere in the Gun Control Act. But ATF blackballs anybody who's a responsible party on a license that gets revoked or has an action taken against it. But they can't take that action against Mr. Clerchian if he's ultimately acquitted because of 923F4, right? In relation to his license, yes. So that does seem a curious outcome, but the government can do curious things, right? They can say if they want, well, okay, we give you a pass, even though you're the one we chose to go after and prosecute. But these are responsible parties over here, and they don't get the benefit of 923F4, right? Well, and that becomes a question as to whether or not that's a just outcome. Even if we thought that was somehow, you know, didn't strike us as particularly good policy, if it's the policy decision Congress has made, it is what it is, isn't it? I suppose, Your Honor, I suppose that would be. Okay. Anything more, counsel? No, not from me. Okay. Well, thank you. Thank you. We'll take the case under advisement and thank counsel again in this case for the excellent briefing and argument. We'd also like to meet you at sidebar and also welcome our guests from the Wharton School who are here in court watching us. Welcome. Hope you enjoyed it. Saw some pretty good lawyering here, so welcome. The clerk will adjourn court.